1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CLARENCE BURDAN,

12              Petitioner,                    No. CIV. S-05-0047-FCD-EFB P

13        vs.

14   D.L. RUNNELS, et al.,

15              Respondents.                   FINDINGS & RECOMMENDATIONS

16   _____/

17        Petitioner, a fifty-seven year old state prisoner proceeding through counsel, filed this

18   action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  He challenges former California

19   Governor Gray Davis's October 3, 2003 reversal of the decision of the California Board of

20   Prison Terms (hereinafter, the "Board")[1] that petitioner is suitable for parole.  Upon careful

21   consideration of the record and the applicable law, the undersigned recommends that petitioner's

22   application for habeas corpus relief be granted.

23   ////

24   ////

25   _____

26        [1] California has since replaced the Board of Prison Terms with the Board of Parole
     Hearings.  *See* Cal. Penal Code § 5075(a).

                                                1

PROCEDURAL BACKGROUND

In 1984, petitioner pled guilty in Sacramento County Superior Court to one count of second degree murder in violation of California Penal Code section 187, and was sentenced to a state prison term of fifteen years to life with the possibility of parole.  Pet. at 2.

Between 1991 and 2002, petitioner appeared before the Board seven times for separate parole hearings, and was found unsuitable for parole each time.  Pet., Ex. 2 at ¶ 4.  On May 13, 2003, at petitioner's eighth parole hearing, the Board found that petitioner was "suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  Pet., Ex. 6 at 37.  However, on October 3, 2003, then-Governor Gray Davis reversed the Board's decision to parole petitioner.  Pet., Ex. 9.

On December 8, 2003, petitioner filed a habeas petition in Sacramento County Superior Court.  Pet., Ex. 10.  On January 7, 2004, the Superior Court issued a reasoned decision affirming the Governor's decision and denying the petition.  *Id.*

Petitioner then submitted a habeas petition to the California Court of Appeal for the Third Appellate District on February 20, 2004.  Pet., Ex. 11.  On March 25, 2004, the appellate court denied the petition, stating only: "The petition for writ of habeas is denied."  *Id.*

Finally, on August 3, 2004, petitioner submitted a habeas petition to the California Supreme Court.  Pet., Ex. 12.  That petition was summarily denied on October 12, 2004.  *Id.*

Petitioner's federal habeas petition was received for filing by this court on January 10, 2005.

DISCUSSION

I. Standards of Review Applicable to Habeas Corpus Claims

Pursuant to 28 U.S.C. § 2254, a person in custody under a state court judgment may apply for a writ of habeas corpus "on the ground he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Because petitioner filed his application for a writ after the effective date of the Antiterrorism and Effective Death Penalty

2

1   Act ("AEDPA"), the writ may not be granted with respect to any claim that was adjudicated on

2   the merits in state court unless the state court's adjudication of the claim:

3               (1) resulted in a decision that was contrary to, or involved an
                unreasonable application of, clearly established Federal law, as
4               determined by the Supreme Court of the United States; or

5               (2) resulted in a decision that was based on an unreasonable
                determination of the facts in light of the evidence presented in the
6               State court proceeding.

7   *Id.* § 2254(d) (referenced herein as § 2254(d) or AEDPA); *see also Penry v. Johnson*, 532 U.S.

8   782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362 (2000); *Lockhart v. Terhune*, 250 F.3d

9   1223, 1229 (9th Cir. 2001).

10          Under the "contrary to" clause of § 2254(d)(1), a writ may be granted if the state court

11   "applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it

12   confronts a set of facts that are materially indistinguishable from a decision' of the Supreme

13   Court and nevertheless arrives at a different result." *Early v. Packer*, 537 U.S. 3, 8 (2002)

14   (quoting *Williams*, 529 U.S. at 405-06).  Under the "unreasonable application" clause, a writ

15   may be granted if the state court identifies the correct governing legal principle from the

16   Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

17   case.  *Williams*, 529 U.S. at 413.

18          In determining whether the state court's decision is contrary to, or an unreasonable

19   application of, clearly established federal law, a federal court looks to the last reasoned state

20   court decision addressing the merits of the petitioner's claim.  *Robinson v. Ignacio*, 360 F.3d

21   1044, 1055 (9th Cir. 2004).  Here, the last reasoned rejection of petitioner's claim was the

22   January 7, 2004 decision of the Sacramento County Superior Court affirming the Governor's

23   decision; therefore, this court will analyze whether the January 7, 2004 reasoned state judgment

24   was erroneous under the standard of § 2254(d).

25   ////

26   ////

3

II.  Petitioner's Claim

The Board, after consideration of the relevant factors, found that petitioner was suitable for parole.  The Governor, relying on the nature of petitioner's commitment offense, overturned that decision.  Petitioner contends that the Governor's October 3, 2003 reversal of the Board's finding that he is suitable for parole violated his due process rights under the United States Constitution.[2]  Pet'rs P. & A. in Supp. of Pet. ("P. & A.") at 1.

A.  Due Process in the California Parole Context

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law.  One alleging a due process violation must first demonstrate that he was deprived of a liberty or property interest protected by the Due Process Clause and then show that the procedures attendant upon the deprivation were not constitutionally sufficient.  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause of the United States Constitution or state laws.  *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution does not, of its own force, create a protected liberty interest in a parole date, even one that has been set.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest."  *McQuillion*, 306 F.3d at 901 (quoting *Greenholtz v. Inmates of Neb. Penal*, 442 U.S. 1, 12 (1979)).

California's parole scheme gives rise to a cognizable liberty interest in release on parole, even for prisoners who have not already been granted a parole date.  *Sass v. Cal. Bd. of Prison*

---

[2]  Petitioner also argues that the Governor's October 3, 2003 decision violated the terms of his plea agreement.  P. & A. at 8.  However, because this court finds that petitioner's writ should be granted on alternative grounds, this issue need not be reached.

*Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; *see also In re Lawrence*, 44 Cal.4th 1181, 1204, 1210, 1221 (2008). Accordingly, this court must examine whether California provided the constitutionally-required procedural safeguards when depriving petitioner of a protected liberty interest and, if not, whether the Sacramento County Superior Court's conclusion that it did was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.

The Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process with respect to his constitutionally protected liberty interest in a parole release date if the board's decision is not supported by "'some evidence in the record,' or is 'otherwise arbitrary.'" *Irons v. Carey*, 505 F.3d 846, 851 (9th Cir. 2007) (quoting *Superintendent v. Hill*, 472 U.S. 445, 457 (1985)).[3] "The 'some evidence' standard is minimally stringent," and a decision will be upheld if there is any evidence in the record that could support the conclusion reached by the factfinder. *Powell v. Gomez*, 33 F.3d 39, 40 (9th Cir. 1994) (citing *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987)); *Toussaint v. McCarthy*, 801 F.2d 1080, 1105 (9th Cir. 1986). However, "the evidence underlying the board's decision must have some indicia of reliability." *Jancsek v. Or. Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987); *see also Perveler v. Estelle*, 974 F.2d 1132, 1134 (9th Cir. 1992). Determining whether the "some evidence" standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or the weighing of evidence. *Toussaint*, 801 F.2d at 1105. The question is whether there is any reliable evidence in the record that could support the

---

[3] Respondents argue that petitioner's claims must fail under AEDPA because there is no "clearly established" federal law establishing that petitioner has a liberty interest in parole or that the "some evidence" test applies to parole decisions (even though Respondents earlier argued that the "some evidence" test is applicable). Resp.'s Ans. at 9, 12; Resp.'s Resp. to Pet'rs Not. of Supp'l Auth. at 7. These arguments, however, have been consistently rejected by the Ninth Circuit. *Irons*, 505 F.3d at 850-51; *Sass*, 461 F.3d 1128-29; *Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 903, 904.

1   conclusion reached.  *Id.*

2       Under California law, the Governor considers the same factors as the Board in

3   determining whether to affirm or reverse the Board's parole decision.  Cal. Const., art. V, § 8(b);

4   *In re Rosenkrantz*, 29 Cal.4th 616, 660 (2002).  Therefore, the Governor's decision to reverse a

5   parole grant is reviewed under the same procedural due process principles that are used to review

6   challenges to the Board's denial of parole.

7       When assessing whether a state parole board's suitability decision, or in the present case,

8   the Governor's reversal of the Board's suitability decision, was supported by "some evidence,"

9   the analysis "is framed by the statutes and regulations governing parole suitability

10  determinations in the relevant state."  *Irons*, 505 F.3d at 851.   This court must:

11              look to California law to determine the findings that are necessary
                to deem a prisoner unsuitable for parole, and then must review the
12              record in order to determine whether the state court decision
                holding that these findings were supported by "some evidence" in
13              [petitioner's] case constituted an unreasonable application of the
                "some evidence" principle articulated in *Hill*.

14

15  *Id.*

16      Under California law, prisoners serving indeterminate prison sentences "may serve up to

17  life in prison, but [] become eligible for parole consideration after serving minimum terms of

18  confinement."  *In re Dannenberg*, 34 Cal. 4th 1061, 1078 (2005).  The Board normally sets a

19  parole release date one year prior to the inmate's minimum eligible parole release date, and does

20  so "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in

21  respect to their threat to the public."  *In re Lawrence*, 44 Cal.4th at 1202 (citing Cal. Penal Code

22  § 3041(a)).  A release date *must* be set "unless [the Board] determines that the gravity of the

23  current convicted offense or offenses, or the timing and gravity of current or past convicted

24  offense or offenses, is such that consideration of the *public safety* requires a more lengthy period

25  of incarceration . . . and that a parole date, therefore, cannot be fixed . . . ."  Cal. Penal Code

26  § 3041(b).

1    In order to carry out the mandate of section 3041, the Board must determine "whether the

2    inmate poses '*an unreasonable risk of danger to society if released from prison*,' and thus

3    whether he or she is suitable for parole."  *In re Lawrence*, 44 Cal.4th at 1202 (citing Cal. Code

4    Regs. tit. 15, § 2281(a)) (emphasis added).  In doing so, the Board must consider all relevant,

5    reliable information available regarding

6        the circumstances of the prisoner's social history; past and present
         mental state; past criminal history, including involvement in other
7        criminal misconduct which is reliably documented; the base and
         other commitment offenses, including behavior before, during and
8        after the crime; past and present attitude toward the crime; any
         conditions of treatment or control, including the use of special
9        conditions under which the prisoner may safely be released to the
         community; and any other information which bears on the
10       prisoner's suitability for release.

11   Cal. Code Regs. tit. 15, § 2281(b).

12   The regulation identifies circumstances that tend to show suitability or unsuitability for

13   release.  *Id.*, § 2281(c) & (d).  The following circumstances tend to show that a prisoner is

14   suitable for release: (1) the prisoner has no juvenile record of assaulting others or committing

15   crimes with a potential of personal harm to victims; (2) the prisoner has experienced reasonably

16   stable relationships with others; (3) the prisoner has performed acts that tend to indicate the

17   presence of remorse or has given indications that he understands the nature and magnitude of his

18   offense; (4) the prisoner committed his crime as the result of significant stress in his life; (5) the

19   prisoner's criminal behavior resulted from having been victimized by battered women syndrome;

20   (6) the prisoner lacks a significant history of violent crime; (7) the prisoner's present age reduces

21   the probability of recidivism; (8) the prisoner has made realistic plans for release or has

22   developed marketable skills that can be put to use upon release; and (9) institutional activities

23   indicate an enhanced ability to function within the law upon release.  *Id.*, § 2281(d).

24   The following circumstances tend to indicate unsuitability for release: (1) the prisoner

25   committed the offense in an especially heinous, atrocious, or cruel manner; (2) the prisoner had a

26   previous record of violence; (3) the prisoner has an unstable social history; (4) the prisoner's

1   crime was a sadistic sexual offense; (5) the prisoner had a lengthy history of severe mental

2   problems related to the offense; and (6) the prisoner has engaged in serious misconduct in prison.

3   *Id.*, § 2281(c).  Factors to consider in deciding whether the prisoner's offense was committed in

4   an especially heinous, atrocious, or cruel manner include: (A) multiple victims were attacked,

5   injured, or killed in the same or separate incidents; (B) the offense was carried out in a

6   dispassionate and calculated manner, such as an execution-style murder; (C) the victim was

7   abused, defiled or mutilated during or after the offense; (D) the offense was carried out in a

8   manner that demonstrated an exceptionally callous disregard for human suffering; and (E) the

9   motive for the crime is inexplicable or very trivial in relation to the offense.  *Id.*, § 2281(c)(1)(A)

10  - (E).

11         In California, the overriding concern in determining parole suitability is public safety and

12  the focus is on the inmate's *current* dangerousness.  *In re Dannenberg*, 34 Cal.4th at 1086; *In re*

13  *Lawrence*, 44 Cal.4th at 1205.  The California Supreme Court recently stated:

14             [T]he Penal Code and corresponding regulations establish that the
               fundamental consideration in parole decisions is public safety
15             [and] the core determination of "public safety" . . . involves an
               assessment of an inmate's *current* dangerousness. . . . [A] parole
16             release decision authorizes the Board (and the Governor) to
               identify and weigh only the factors relevant to predicting "whether
17             the inmate will be able to live in society without committing
               additional antisocial acts."  These factors are designed to guide an
18             assessment of the inmate's threat to society, *if released*, and hence
               could not logically relate to anything but the threat *currently* posed
19             by the inmate.

20  *In re Lawrence*, 44 Cal.4th at 1205-06 (internal citations omitted).  Accordingly, in reviewing a

21  decision by the Board or the Governor to deny parole to an inmate, "the relevant inquiry is

22  whether some evidence supports the decision of the Board or the Governor that the inmate

23  constitutes a current threat to public safety, and not merely whether some evidence confirms the

24  existence of certain factual findings."  *Id.* at 1212 (citing *In re Rosenkrantz*, 29 Cal.4th at 658; *In*

25  *re Dannenberg*, 34 Cal. 4th at 1071; *In re Lee*, 143 Cal. App. 4th 1400, 1408 (2006)).

26  ////

1    Additionally, in recent years the Ninth Circuit Court of Appeals has revealed that, given

2    the liberty interest that California prisoners have in release on parole, a continued reliance upon

3    an unchanging factor to support a finding of unsuitability for parole over time constitutes a

4    violation of due process.  The court has addressed the issue in three significant cases, each of

5    which will be discussed below.

6    First, in *Biggs*, the Ninth Circuit Court of Appeals recognized that a continued reliance

7    on an unchanging factor to deny parole, such as the circumstances of the offense, could at some

8    point result in a due process violation.[4]  While the court in *Biggs* rejected several of the reasons

9    given by the Board for finding the petitioner in that case unsuitable for parole, it upheld three:

10   (1) petitioner's commitment offense involved the murder of a witness; (2) the murder was

11   carried out in a manner exhibiting a callous disregard for the life and suffering of another; and

12   (3) petitioner could benefit from therapy.  *Biggs*, 334 F.3d at 913.  However, the court in *Biggs*

13   cautioned that continued reliance solely upon the gravity of the offense of conviction and

14   petitioner's conduct prior to committing that offense in denying parole could, at some point,

15   violate due process.  In this regard, the court observed:

16         As in the present instance, the parole board's sole supportable
            reliance on the gravity of the offense and conduct prior to
17         imprisonment to justify denial of parole can be initially justified as
            fulfilling the requirements set forth by state law.  Over time,
18         however, should Biggs continue to demonstrate exemplary
            behavior and evidence of rehabilitation, denying him a parole date
19         simply because of the nature of Biggs' offense and prior conduct
            would raise serious questions involving his liberty interest in
20         parole.

21   *Id.* at 916.  The court in *Biggs* also stated that "[a] continued reliance in the future on an

22   unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

23   contrary to the rehabilitative goals espoused by the prison system and could result in a due

24   process violation."  *Id.* at 917.

25   _____

26         [4] That holding has been acknowledged as representing the law of the circuit.  *Irons*, 505
     F.3d at 853; *Sass*, 461 F.3d at 1129.

1    In *Sass*, the Board found the petitioner unsuitable for parole at his third suitability

2 hearing based on the gravity of his offenses of conviction in combination with his prior offenses.

3 461 F.3d at 1126.  Citing *Biggs*, the petitioner in *Sass* contended that reliance on these

4 unchanging factors violated due process.  The court disagreed, concluding that these factors

5 amounted to "some evidence" to support the Board's determination.  *Id.* at 1129.  The court

6 provided the following explanation for its holding:

7           While upholding an unsuitability determination based on these
            same factors, we previously acknowledged that "continued
8           reliance in the future on an unchanging factor, the circumstance of
            the offense and conduct prior to imprisonment, runs contrary to the
9           rehabilitative goals espoused by the prison system and *could* result
            in a due process violation."  *Biggs*, 334 F.3d at 917 (emphasis
10          added).  Under AEDPA it is not our function to speculate about
            how future parole hearings could proceed.  *Cf. id.*  The evidence of
11          Sass' prior offenses and the gravity of his convicted offenses
            constitute some evidence to support the Board's decision.
12          Consequently, the state court decisions upholding the denials were
            neither contrary to, nor did they involve an unreasonable
13          application of, clearly established Federal law as determined by the
            Supreme Court of the United States.  28 U.S.C. § 2254(d).

14

15 *Id.*

16    In *Irons,* the Ninth Circuit sought to harmonize the holdings in *Biggs* and *Sass*, stating as

17 follows:

18          Because the murder Sass committed was less callous and cruel
            than the one committed by Irons, and because Sass was likewise
19          denied parole in spite of exemplary conduct in prison and evidence
            of rehabilitation, our decision in *Sass* precludes us from accepting
20          Iron's due process argument or otherwise affirming the district
            court's grant of relief.
21
            We note that in all the cases in which we have held that a parole
22          board's decision to deem a prisoner unsuitable for parole solely on
            the basis of his commitment offense comports with due process,
23          the decision was made before the inmate had served the minimum
            number of years required by his sentence.  Specifically, in *Biggs*,
24          *Sass*, and here, the petitioners had not served the minimum number
            of years to which they had been sentenced at the time of the
25          challenged parole denial by the Board.  *Biggs*, 334 F.3d at 912;
            *Sass*, 461 F.3d at 1125.  All we held in those cases and all we hold
26          today, therefore, is that, given the particular circumstances of the

10

offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

Furthermore, we note that in *Sass* and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole.  We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the
liberty interest in parole that flows from the relevant California statutes. *Biggs*, 334 F.3d at 917.

*Irons*, 505 F.3d at 853-54.[5]

B.  Petitioner's State Proceedings

In May 2003, the Board found petitioner suitable for parole and concluded that he "would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." Pet., Ex. 6, at 37.  The Board stated that its conclusion was based on the following circumstances: (1) petitioner has no juvenile record of assaulting others; (2) petitioner has a stable social history, as exhibited by reasonably stable relationships with others; (3) petitioner enhanced his ability to function within the law upon release through participating in self-help programs, including anger management classes, AA, a Category X program, and a Category T program with good results; (4) petitioner participated in vocational programs and has skills in various trades; (5) petitioner lacks a significant criminal history of violent crimes; (6)

_____

[5]  The California Supreme Court has also acknowledged that the aggravated nature of the commitment offense, over time, may fail to provide some evidence that the inmate remains a current threat to public safety.  *In re Lawrence*, 44 Cal.4th at 1218-20 & n. 20.
Additionally, a recent panel of the Ninth Circuit in *Hayward v. Marshall*, 512 F.3d 536, 546-47 (9th Cir. 2008), determined that under the "unusual circumstances" of that case the unchanging factor of the gravity of the petitioner's commitment offense did not constitute "some evidence" supporting the Governor's decision to reverse a parole grant on the basis that the petitioner would pose a continuing danger to society.  However, on May 16, 2008, the Court of Appeals decided to rehear that case en banc.  *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008).  Therefore, the panel decision in *Hayward* is no longer citable precedent.

1   petitioner's maturation, growth, greater understanding and advanced age have reduced his

2   probability of recidivism; (7) petitioner has realistic parole plans, including a job offer and

3   family support; (8) petitioner has maintained close family ties, especially with his daughter; (9)

4   petitioner has maintained positive institutional behavior while incarcerated, which indicates

5   improvement in self-control; and (10) petitioner did not receive any major disciplinary conduct

6   while incarcerated (and the Board was satisfied that none of his minor disciplinary infractions

7   made him ineligible for parole). *Id.* at 37-39.  The Board also considered: (A) a psychological

8   report dated 12/11/01, stating that petitioner's violence potential is "extremely small"; there are

9   no mental, emotional, or psychological factors that would interfere with petitioner being granted

10  parole; and the prognosis for petitioner's "successful adjustment in the community is

11  outstanding"; (B) a psychological report dated 3/12/99, stating petitioner's violence potential and

12  dangerousness if released are "definitely below average"; petitioner's commitment offense

13  "occurred at a time of emotional distress and was, in many ways, quite situational"; petitioner "is

14  not an aggressive or violent individual by nature"; the probability of this kind of offense ever

15  occurring again is "minimal to none"; and there are no significant risk factors associated with

16  petitioner's case; (C) an assessment of dangerousness from petitioner's correctional counselor,

17  stating that considering the commitment offense, prior record, and prison adjustment, he believes

18  petitioner "would pose a low degree of threat to the public if released"; and (D) the fact that the

19  deputy district attorney who was present at the parole hearing did not oppose the Board's finding

20  of suitability. *Id.* at 39-43.

21         However, on October 3, 2003, then-Governor Gray Davis reversed the Board's decision.

22  The Governor explained that decision as follows:

23         According to the probation officer's report, sometime during
           October 1983 [petitioner], age 32, discovered that his wife Charity
24         Burdan was having an affair with another woman.  Over the course
           of a month, [petitioner] moved in and out of their home several
25         times.  On November 20, 1983, [petitioner] went to the home of
           his wife's lover and witnessed the two women together.  The next
26         morning, he demanded that his wife move out.

12

On November 22, 1983, [petitioner] borrowed a gun from a friend, claiming it was for target practice. He then called his wife and asked her to meet him that evening. Ms. Burdan told her sister that she had informed [petitioner] that she was leaving him and that they were meeting to discuss a divorce.

At approximately 8:00 p.m., a neighbor police officer, was taking out his trash. He heard Ms. Burdan calling his name and honking her horn. As he walked towards the Burdan's driveway, the officer saw [petitioner] and his wife sitting in her car, arguing and struggling. The officer heard three gunshots. He ran back into his house, called police and grabbed his gun. When he returned to the car, he heard another two gunshots.

The officer urged [petitioner] to hand over his gun. Instead, [petitioner] tried to shoot himself, saying "I can't make it work. I can't make it work." The officer was able to wrench the gun from [petitioner's] grasp. [Petitioner] asked for a gun so that he could kill himself and then attempted to grab the officer's gun. After a brief struggle, [petitioner] was handcuffed.

When the officer went to check Ms. Burdan's condition, [petitioner] stated, "Don't bother. She's dead." After his arrest, [petitioner] admitted bringing the gun with the intent to kill his wife and then commit suicide. Ms. Burdan died from multiple gunshot wounds to the head, neck, and torso.

[Petitioner] pled guilty to second degree murder. He was sentenced to 15 years to life.

In finding [petitioner] suitable for parole, the Board found that he had a stable social history and lacked both a juvenile assaultive criminal history and a significant criminal record. The Board found that he had maintained positive institutional behavior and had enhanced his ability to function within the law through participation in self-help therapy groups, educational programs and institutional job assignment. [Petitioner] was found to have realistic parole plans and a reduced probability of recidivism because of his maturation, growth, greater understanding and advanced age. The Board also found that [petitioner's] most recent psychiatric reports, in 2001 and 1999, were favorable.

[Petitioner] has made laudable progress while incarcerated. He has attended self-help and therapy programs, and has maintained positive institutional behavior. [He] has expressed both remorse and responsibility since arrest. He has established viable parole plans and has received support from his family. Prior to incarceration, [he] had no criminal history or substance abuse problems. These are positive factors lending support to a finding of suitability for parole. However, I believe they are outweighed by each of several negative factors indicating that [petitioner]

1    would pose an unreasonable risk to public safety.

2    I believe the Board of Prison Terms gave inadequate consideration
     to the gravity of the crime.  [Petitioner] was jealous and unhappy
3    over his marital difficulties.  Angry over his wife's continued
     affair, he forced her to move out of their home.  Still unsatisfied,
4    he formed a plan to kill her.  The next day, he borrowed a gun,
     bought additional ammunition, and lured his wife to their home
5    under the premise of ending the relationship.  [Petitioner] shot his
     wife five times at close range, emptying the gun.  He fired three
6    shots, pulling the hammer back after each shot in order to fire
     again.  Even after being interrupted by his police officer neighbor,
7    [petitioner], still not satisfied that he had killed his wife, fired his
     gun twice more.
8
     I find [petitioner's] disregard for the life and suffering of others
9    particularly callous.  He took advantage of the trust inherent in a
     marriage to convince his wife to speak with him.  He lured her into
10   an isolated setting where she was particularly vulnerable and then
     shot her five times at point blank range.  When the police officer
11   went to check on her condition, [petitioner] stated "Don't bother.
     She's dead."
12
     [Petitioner] confessed that he intended to kill his wife.  The facts
13   clearly indicate a level of premeditation and deliberation and are
     far more egregious than the minimum necessary to sustain a
14   conviction of second degree murder.  I believe that the gravity of
     this calculated offense alone is such that consideration of the
15   public safety requires a more lengthy period of incarceration.

16   I also note that the Sacramento Police Department opposed parole,
     finding that [petitioner's] crime warrants that he be incarcerated
17   "for the full length of his term, which is life."  Because the police
     are familiar with [petitioner] and his crime, and are an authority on
18   assessing public safety, I find their conclusion that he remains a
     danger to the public is persuasive and a negative factor weighing
19   against parole.

20   I commend [petitioner] for his self-help and therapy attendance
     during his 19 years in prison.  Clearly he is on the right path.
21   However, his crime against his wife was particularly violent and
     yet he has only attended two domestic violence workshops.
22   Likewise, although [petitioner] has participated in the alternative
     to violence programs, I believe he needs more time immersed in
23   these programs before he is ready for release.

24   Pet., Ex. 9.

25        Governor Davis's reversal of the Board was reviewed by the Sacramento County

26   Superior Court pursuant to a state petition.  Emphasizing the Governor's heavy reliance on the

                              14

gravity of the offense that court upheld the Governor's decision, stating:

> Governor Davis engaged in a proper review [and] found all factors other than the commitment offense to be favorable for petitioner. However, Governor Davis also found that the severity of the commitment offense outweighed the favorable factors, and rendered petitioner still a danger to society if released now on parole.
>
> This case is very similar to that in [*In re Rosenkrantz*, 29 Cal. 4th 616 (2002)]. As in *Rosenkrantz*, Governor Davis here found that the petitioner had premeditated and deliberated the murder, in that he borrowed a gun from a friend beforehand, then lured his wife, the victim, to a meeting place, being in their car in front of their house, where he then proceeded to shoot her several times in the head. By finding that petitioner had engaged in planned and deliberate behavior, Governor Davis found a reasonable ground on which to distinguish the commitment offense from other second degree murders. That met the "some evidence" standard in *Rosenkrantz*, and meets that standard in this case.
>
> Petitioner may view his crime as one of heat of passion, but Governor Davis rejected that view, finding the fact that petitioner had borrowed the gun from a friend in advance, and then luring his wife to the spot, unsuspecting that petitioner would be armed with a gin and probably planning to shoot her and then kill himself, was not "heat of passion" as required for voluntary manslaughter. Indeed, Governor Davis thought the evidence showed first degree murder that was not reduced to manslaughter by any heat of passion or sudden quarrel, but was planned in advance and carried out, at least as far as killing his wife. Governor Davis was not required to view the crime in the mitigating light that petitioner would have wanted him to see. And, Governor Davis's conclusion was based on "some evidence," being circumstances of the crime that had previously been admitted and summarized.
>
> ***
>
> Petitioner appears to have been a model prisoner in his 19 years of incarceration. He has attended self-help, has no psychological problems, has an exemplary work record, has been virtually disciplinary-free with only a few very minor infractions that are years old, and he has realistic parole plans, including a place to live, with his daughter, whose mother he murdered and who has forgiven him, and a viable offer of employment. Petitioner would appear to be a viable candidate for parole. However, *Rosenkrantz* dictates that this court be deferential in its "some evidence" review of the Governor's decision in reversing the grant of parole, and in this case, because the Governor reasonably found circumstances of the crime to exist that showed that the murder was premeditated, deliberated, and executed with an intent to kill, without any heat of passion or sudden quarrel, and because the Governor reasonably

1
2

found that serving only 19 years in prison is not yet sufficient to
render petitioner a non-threat to the public safety if now released
on parole, the "some evidence" standard has been sufficiently met.

3    Pet., Ex. 10.

4          The state court also rejected petitioner's claim that after 19 years in prison, "due process

5    disallows the seriousness of the offense to remain the sole ground for rejecting parole." *Id.* The

6    court stated that because "[p]etitioner has only spent 19 years in prison, which was only 4 years

7    beyond the minimum 15" he was sentenced to, it did "not appear that petitioner has served so

8    long a period of time in prison that reversing a grant of parole based solely on the commitment

9    offense at this time raises any serious due process concern." *Id.* To put it shortly, the court

10   stated that "the time ha[d] not yet arisen" for petitioner's due process claim. *Id.*

11         C. Analysis

12         The last reasoned rejection of petitioner's claim is the decision of the Sacramento County

13   Superior Court affirming the Governor's October 3, 2003 decision. Accordingly, this court will

14   review that opinion to determine whether "some evidence" supported the court's conclusion and

15   the Governor's findings that petitioner is unsuitable for parole because he is *currently* dangerous.

16   *In re Lawrence*, 44 Cal.4th at 1191. For the reasons explained below, this court finds that it did

17   not.

18         In affirming Governor Davis's decision, the superior court found that the Governor's

19   reliance on petitioner's commitment offense satisfied the "some evidence" standard.[6] Pet., Ex.

20   _____

21         [6] The Sacramento County Superior Court found that the Governor relied solely upon
     petitioner's commitment offense. Indeed, the Governor's written decision states that "the gravity
22   of th[e] offense *alone* is such that consideration of the public safety requires a more lengthy
     period of incarceration." However, the Governor's decision mentioned two other factors, neither
23   of which satisfies the some evidence standard applicable to review of this petition. Pet., Ex. 9.
           First, the Governor stated that he found a letter from the Chief of the Sacramento Police
24   Department opposing parole "persuasive and a negative factor weighing against parole." *Id.* In
     the letter, the Chief merely summarized petitioner's commitment offense, stated that his
25   "conduct while in our community warrants that he be incarcerated for the full length of the
     term," and concluded that petitioner's release "would pose great risk to the community." Pet.,
26   Ex. 6. Although letters from law enforcement are to be considered during the parole process,
     Cal. Penal Code § 3046(c), there are several reasons why the letter does not constitute "some

16

10 (stating "Governor Davis engaged in a proper review [and] found all factors other than the commitment offense to be favorable for petitioner" and "Governor Davis's conclusion was based on 'some evidence,' being circumstances of the crime that had previously been admitted and summarized.").  The court focused on the Governor's finding that petitioner's commitment offense was premeditated, deliberated, and executed with an intent to kill.  The court analogized petitioner's case to *In re Rosenkrantz*, 29 Cal.4th 616 (2002), a California case in which the petitioner was found to have premeditated and deliberated the murder of his wife, and then concluded that "[b]y finding that petitioner had engaged in planned and deliberative behavior, Governor Davis found a reasonable ground on which to distinguish the commitment offense from other second degree murders.  That met the 'some evidence' standard in *Rosenkrantz*, and meets that standard in this case."  Pet., Ex. 10.

---

evidence" of petitioner's current dangerousness.  First, the Governor did not purport to deny parole based on the letter; instead, he considered it a "negative factor."  *Rosenkrantz*, 444 F. Supp. 2d at 1080 n.14.  This is likely because "voiced opposition to parole is not an enumerated unsuitability factor . . .  and such argument is not evidence of unsuitability."  *Saldate v. Adams*, 2008 WL 2705551, at *6 (E.D. Cal. July 10, 2008).  Second, the letter opposed parole based solely upon the police chief's view of the gravity of the offense, so his opposition was "merely cumulative of the [Governor's] own determination regarding the callousness of the crime."  *Id.* Third, the police chief's opposition only focuses on petitioner's "conduct while in [his] community" and does not have a bearing on petitioner's *current* dangerousness.  *Id.* at *3 (quoting *In re Tripp*, 150 Cal. App. 4th 306, 313 (2007)) ("The denial of parole will not be upheld where the BPH "attaches significance to evidence that forewarns no danger to the public or relies on an unsupported conclusion.").

        Second, the Governor stated that petitioner should have attended more than two domestic violence workshops, and needs more time in programs like the alternative to violence programs. Pet., Ex. 9.  Such statements by the Governor also do not constitute "some evidence" of petitioner's current dangerousness.  First, the Governor did not purport to deny petitioner parole on the basis of these opinions (likely because lack of participation in self-help groups is not an enumerated unsuitability factor).  Cal. Code Regs. tit. 15, § 2281(c)*; Rosenkrantz*, 444 F. Supp. 2d at 1080 n.14.  Second, the Governor's finding on this point was contrary to the evidence in the record and arbitrary, given that domestic violence programs are not offered at the prison where petitioner has been incarcerated since September 1997 and petitioner has spent over 500 hours in self-help groups such as Alternatives to Violence.  Pet., Ex. 2, ¶ 6; Not. of Supp'l Auth. at 2, n.1; Ex. 6, at 34.  *See Thomas v. Brown*, 513 F. Supp. 2d 1124, 1134 (N.D. Cal. 2006) ("The Governor cannot have it both ways: if he wants to say an inmate needs to work on anger management, he cannot ignore it when the inmate works on anger management. There was not some evidence to support the Governor's determination that Thomas needed further programming to work on anger management or the causative factors for the killing.").

1    The superior court analogized to and relied heavily on *Rosenkrantz* in concluding that the

2    Governor's decision did not violate petitioner's due process rights.  However, on habeas review

3    a federal district court found that the state court's continued reliance in *Rosenkrantz* on the

4    nature of the petitioner's commitment offense amounted to "an arbitrary denial of petitioner's

5    liberty interest," did "not amount to some evidence supporting the conclusion that petitioner

6    poses an unreasonable risk of danger if released," and therefore violated due process.

7    *Rosenkrantz v. Marshall*, 444 F. Supp. 2d 1063, 1081-82, 1083 (C.D. Cal. 2006).[7]  The federal

8    district court stated:

9               The BPT determined that petitioner posed an unreasonable risk of
                danger (and, therefore, was unsuitable for parole) because his
                crime was especially heinous.  While relying upon petitioner's
10              crime as an indicator of his dangerousness may be reasonable for
                some period of time, in this case, continued reliance on such
11              unchanging circumstances - after nearly two decades of
                incarceration and half a dozen parole suitability hearings - violates
12              due process because petitioner's commitment offense has become
                such an unreliable predictor of his present and future
13              dangerousness that it does not satisfy the "some evidence"
                standard.  After nearly twenty years of rehabilitation, the ability to
14              predict a prisoner's future dangerousness based simply on the
                circumstances of his or her crime is nil.
15

16   *Id.* at 1084; *see also Thomas v. Brown*, 513 F. Supp. 2d 1124, 1132 (N.D. Cal. 2006) ("Although

17   there was evidence of premeditation as the Governor mentioned, . . . Thomas' actions in

18   returning to kill the victim after the initial argument ended is the kind of immutable event that

19   *Biggs* cautioned against relying on in perpetuity to deny parole for present dangerousness.

20   Thomas' exemplary behavior in prison plus his efforts to work on anger management plus his

21   favorable current psychological reports reduce the predictive value of this fact 20 years after the

22   killing.").

23   ////

24

25         [7] The Central District of California's decision in *Rosenkrantz,* which was cited favorably
     by the Ninth Circuit in *Hayward*, 512 F.3d at 546, currently being reheard en banc, *supra* n.5,
26   was issued after the Sacramento County Superior Court issued its decision here to deny Burdan's
     state petition.

18

1    The continued reliance on the nature of the commitment offense in this case is even more

2    problematic when the explanations for that reliance are reviewed in light of the standards for

3    when the circumstances of the offense have some bearing upon parole suitability.  In this case,

4    the Governor stated that he found petitioner's "disregard for the life and suffering of others

5    particularly callous" and concluded that "the gravity of [petitioner's] calculated offense alone is

6    such that consideration of the public safety requires a more lengthy period of incarceration."

7    Pet., Ex. 9.  The Governor's reliance on the crime being "particularly callous" suggests that his

8    finding of unsuitability was based on the first circumstance listed in § 2281(c), that petitioner

9    "committed the offense in an especially heinous, atrocious, or cruel manner," and specifically,

10   that petitioner's commitment offense was carried out in a manner that demonstrated an

11   exceptionally callous disregard for human suffering.  *See* Cal. Code Regs. tit. 15, § 2281(c)(1),

12   (c)(1)(D).  For this section to justify overturning the Board's parole suitability finding there must

13   be "some evidence" to support an exceptionally callous determination.

14       A conviction for second degree murder cannot, of itself, satisfy the "some evidence"

15   standard.  "Second degree murder by its nature evinces a certain level of callousness because it

16   'requires express or implied malice - i.e., the perpetrator must kill another person with the

17   specific intent to do so; or he or she must cause another person's death by intentionally

18   performing an act, knowing it is dangerous to life and with conscious disregard for life.'"  *In re*

19   *Smith*, 114 Cal.App.4th 343, 366 (2003).  Therefore, "it can reasonably be said that all second

20   degree murders by definition involve some callousness - i.e., lack of emotion or sympathy,

21   emotional insensitivity, indifference to the feelings or suffering of others."  *Trunzo v. Ornoski*,

22   2008 WL 703770, at *12 (N.D. Cal. Mar 13, 2008) (quoting *In re Smith*, 114 Cal.App.4th at

23   366).  The California courts have stated that in order to demonstrate "an exceptionally callous

24   disregard for human suffering" within the meaning of applicable provisions of the California

25   parole statutes, "the offense in question must have been committed in a more aggravated or

26   violent manner than that ordinarily shown in the commission of second degree murder.  Such

19

1   circumstances may include 'rehearsing the murder, executing of a sleeping victim, stalking,' or

2   evidence that the defendant 'acted with cold, calculated, dispassion, or that he tormented,

3   terrorized or injured [the victim] before deciding to shoot her; or that he gratuitously increased or

4   unnecessarily prolonged her pain and suffering.'"  *In re Smith*, 114 Cal.App.4th at 367 (internal

5   citation omitted); *see also Leon v. Kane*, 2008 WL 2705156, at *12-13 (E.D. Cal. July 8, 2008).

6        In *Smith*, the petitioner was convicted of second degree murder for killing his wife after

7   learning that his disintegrating marriage was beyond repair as a result of his wife's

8   unfaithfulness.  *In re Smith*, 114 Cal. App. 4th 343.  When the victim told the petitioner that she

9   "did not want anything further to do with [him]," he took a gun and shot her once in the head and

10  then twice more as she fell.  *Id.* at 351.  The court found that the crime was not cruel or callous

11  to the suffering of others and stated: "There is no evidence that [the petitioner] acted with cold,

12  calculated dispassion; or that he tormented, terrorized, or injured [the victim] before deciding to

13  shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering. . . .

14  Was the crime callous?  Yes.  However, are the facts of the crime some evidence that [the

15  petitioner] acted with exceptionally callous disregard for [the victim's] suffering; or do the facts

16  distinguish this crime from other second degree murders as exceptionally callous?  No."  *Id.* at

17  367; *see also In re Lee*, 143 Cal.App.4th at 1409 ("measure of atrociousness is not general

18  notions of common decency or social norms . . . .   Rather, the inquiry is whether among murders

19  the one committed by Lee was particularly heinous, atrocious or cruel").

20        In another similar case in which the petitioner was convicted of second degree murder for

21  killing his wife, a federal district court also found that the facts surrounding the murder did not

22  support a finding that the murder was cruel or callous.  The court summarized the facts as

23  follows:

24        [T]he day before the shooting, petitioner and his wife had a
          lengthy discussion about their marital problems and decided to
25        make a further attempt to repair their marriage.  The next day, his
          wife told him she wanted to stay in town to drink after work; when
26        he later found her at the Moose Lodge, she was with another man.

1
2
3
4

> Upset, he slapped her and left, drank some more and then returned home and went to bed.  When he woke up, his wife was not home, so he returned to the Moose Lodge and found her dancing with another man.  He ordered a drink, waited for the music to stop, and then asked if she was ready to go home.  When his wife said she was going to go home with Ron, her dancing partner, he put his arm around her and shot her in the chest.

5   *Pirtle v. Cal. Bd. of Prison Terms*, 2007 WL 1140817, at *13 (E.D. Cal. Apr. 17, 2007) (internal

6   citations omitted).

7        In this case, as in *Smith* and *Pirtle*, even assuming the Governor's version of the facts

8   surrounding petitioner's commitment offense are correct, there is no evidence that petitioner's

9   murder of his wife was exceptionally callous or cruel.  There is no evidence that petitioner

10  "acted with cold, calculated, dispassion, or that he tormented, terrorized or injured [his wife]

11  before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her

12  pain and suffering."  Nonetheless, even if petitioner's crime *was* particularly callous at the time

13  it was committed, the role of the Governor – and the role of the superior court upon review of the

14  Governor's decision – was to conduct an individualized suitability determination for petitioner

15  and to focus upon the public safety risk *currently* posed by petitioner.  *In re Lawrence*, 44

16  Cal.4th at 1205-06, 1217, 1221.  The relevant inquiry "is not merely whether an inmate's crime

17  was especially callous, or shockingly vicious or lethal, but whether the identified facts are

18  *probative* to the central issue of *current* dangerousness when considered in light of the full

19  record before the Board or the Governor."  *Id.* at 1221; *In re Dannenberg*, 34 Cal.4th at 1070-71.

20       For the reasons clearly and cogently elaborated by the Board, *see* Pet., Ex. 6 at 39-40, the

21  circumstances of petitioner's commitment offense, when considered in light of the extensive

22  evidence of petitioner's in-prison rehabilitation and exemplary behavior over the past 24 years,

23  are not predictive of his *current* dangerousness.  *In re Lawrence*, 44 Cal.4th at 1205-06, 1217,

24  1221; *In re Elkins*, 144 Cal.App.4th 475, 498-99 (2006) (internal citations omitted) ("[T]he

25  commitment offense . . . is an unsuitability factor that is immutable and whose predictive value

26  'may be very questionable after a long period of time.' . . . Reliance on an immutable factor,

21

1   without regard to or consideration of subsequent circumstances, may be unfair, run contrary to

2   the rehabilitative goals espoused by the prison system, and result in a due process violation.").

3   This principle is at the core of the due process question presented here.  Prior to reversing the

4   Board's decision, the Governor acknowledged that petitioner has a stable social history; has no

5   criminal history (juvenile or otherwise) or substance abuse problems; has maintained positive

6   institutional behavior; has enhanced his ability to function within the law through participation in

7   self-help therapy groups, educational programs and institutional job assignments; has a reduced

8   probability of recidivism because of his maturation, growth, greater understanding and advanced

9   age; has favorable psychiatric reports from 2001 and 1999; has expressed both remorse and

10  responsibility since arrest; and has viable parole plans and support from his family.  Pet., Ex. 9.

11       The Sacramento County Superior Court also acknowledged that petitioner "has attended

12  self-help, has no psychological problems, has an exemplary work record, has been virtually

13  disciplinary-free with only a few very minor infractions that are years old, and he has realistic

14  parole plans, including a place to live, with his daughter, whose mother he murdered and who

15  has forgiven him, and a viable offer of employment."  Pet., Ex. 10.  The superior court even went

16  so far as to state that "[p]etitioner appears to have been a model prisoner in his 19 years of

17  incarceration" and appears "to be a viable candidate for parole."  *Id.*  That court's review of the

18  evidence bearing upon petitioner's *current* dangerousness, rather than identifying some evidence

19  of a present danger, reinforces the Board's finding that petitioner is no longer a risk to the public

20  and is suitable for parole.[8]

21       Additionally, a psychological report from 2001 indicates that petitioner's violence

22  potential is extremely small; there are no mental, emotional, or psychological factors that would

23  interfere with petitioner being granted parole; and the prognosis for petitioner's "successful

24  adjustment in the community is outstanding."  Pet., Ex. 6, at 39-40.  A 1999 psychological report

25

26       [8] As the state court explained, it denied the petition solely on the basis of petitioner's
    commitment offense.  Pet., Ex. 9.

22

also revealed that petitioner's commitment offense "occurred at a time of emotional distress and was, in many ways, quite situational" and that the probability of this kind of offense ever occurring again is minimal to none.  *Id.* at 40-41.  Petitioner's correctional counselor opined that petitioner would pose a low degree of threat to the public if released, and the deputy district attorney who was present at petitioner's 2003 parole hearing did not oppose the Board's finding of suitability.  *Id.* at 43.

Before petitioner was granted parole by the Board in 2003, petitioner was denied parole at seven previous parole consideration hearings based on his commitment offense.  And, unlike the petitioners in *Biggs*, *Sass* and *Irons*, at the time of the Governor's decision to reverse petitioner's grant of parole, petitioner had already served 19 years – 4 years beyond his minimum sentence of fifteen years.  He has now been in custody for 24 years – 9 years beyond his minimum sentence.  Because there was simply no evidence in the record to demonstrate that petitioner constituted a current threat to public safety, the Governor's – and the superior court's – reliance upon petitioner's commitment offense to deny petitioner parole for the eighth time violated his right to due process.  Accordingly, petitioner is entitled to federal habeas relief.  *See Tash v. Curry*, 2008 WL 3984597, at *12 (N.D. Cal. Aug. 27, 2008) ("In light of the extensive evidence of Petitioner's in-prison rehabilitation and exemplary behavior, the reliance on the unchanging facts of the murder to deny Petitioner parole for the tenth time – twenty-two years into his minimum seventeen year sentence – violated his right to due process."); *Saldate*, 2008 WL 2705551, at *8 (finding the BPH's denial of parole for petitioner at his fifth parole hearing violated due process because the BPH relied upon "past, unchanging factors that [did not support] a finding the petitioner *currently* pose[d] an unreasonable risk of danger to the public, especially in light of Petitioner's conduct from 1990 onwards."); *Leon v. Kane*, 2008 WL 2705156, at *16 (E.D. Cal. July 08, 2008) ("Given petitioner's rehabilitation, and model conduct while in prison, the court finds that his commitment offense, which occurred twenty-two years ago, does not demonstrate that his release will pose an imminent danger to public safety.

Moreover, the court finds that under the circumstance presented by this case the Board's reliance

on these "stale and static factor[s]" to deny parole after his minimum term has expired violates

petitioner's due process rights."); *Trunzo v. Ornoski*, 2008 WL 703770, at *17 (N.D. Cal. Mar.

13, 2008) (holding that the Board's continued reliance on the petitioner's commitment offense

and criminal history "effectively convert[ed his] sentence of life *with* the possibility of parole

into life *without* the possibility of parole, which violate[d his] liberty interest in parole.");

*McCullough v. Kane*, 2007 WL 1593227, at *9 (N.D. Cal. June 1, 2007) ("In light of the

extensive evidence of [the inmate's] in-prison rehabilitation and exemplary behavior, the

reliance on the unchanging facts of the murder and his juvenile criminality to deny him parole 21

years into his 15-to-life sentence violated his right to due process.  The some evidence standard

provides more protection than against fabricated charges or bureaucratic mistakes - the some

evidence standard also protects against arbitrary decisions. The Governor's decision was

arbitrary and therefore did not comport with the some evidence standard."); *Brown v. Kane*, 2007

WL 1288448, at *6 (N.D. Cal. May 2, 2007) ("This court must consider that at some point after

an inmate has served his minimum sentence the probative value of his commitment offense as an

indicator of 'unreasonable risk of danger to society' recedes below the 'some evidence' required

by due process to support a denial of parole.  A decision to revoke parole based solely on an

inmate's commitment offense that can no longer be considered probative of dangerousness to

society would be arbitrary and not comport with the 'some evidence' standard.  This is one of

those cases. When the Governor reversed the [Board's] grant of parole . . . in 2005, [the inmate]

had served more than 25 years in prison and exceeded his 15-year minimum sentence by more

than ten years." (citations and footnote omitted)); *Pirtle*, 2007 WL 1140817, at *12-13 ("[T]he

Board relied on factors no longer within petitioner's control-the nature of the crime and his prior

history, both criminal and social, while barely acknowledging petitioner's clean institutional

record, steady work history, maturity and introspection-rendering the decision to deny him

parole arbitrary and a violation of his liberty interest in parole."); *Thomas*, 513 F. Supp. 2d at

1   1136 ("This case is just the sort of case *Biggs* envisioned, where the commitment offense is

2   repeatedly relied on to deny parole notwithstanding the prisoner's exemplary behavior and

3   evidence of rehabilitation since the commitment offense.  The murder here, while terrible, was

4   not notably worse than other second degree murders.  And the crime was aberrant behavior

5   rather than part of continuing criminality.  In light of the extensive evidence of [the inmate's]

6   in-prison rehabilitation and exemplary behavior, the reliance on the unchanging factor of the

7   murder to deny [the inmate] parole for the tenth time and 20 years into his 17-to-life sentence

8   violated his right to due process."); *Johnson v. Finn*, 2006 WL 195159, at *12 (E.D. Cal. Jan. 19,

9   2006) (finding due process violation in denial of parole at twelfth parole suitability hearing after

10  petitioner had served twenty-four years of sentence of life with the possibility of parole and met

11  circumstances tending to indicate suitability for parole); and *Masoner v. State*, No.

12  CV-03-1261-ER (C.D. Cal. Jan. 23, 2004) (finding due process violation based on BPT's

13  "continued reliance" on pre-conviction factors to justify denial of parole suitability after

14  petitioner had served twenty-one years of fifteen years to life sentence for second degree murder,

15  had participated in therapy and self-help programming and had impeccable prison record).

16                                          REMEDY

17          In 2003, when the Board determined that petitioner was suitable for parole, it calculated

18  petitioner's term and assessed a total confinement of 240 months, less post-conviction credits of

19  72 months, for a total period of confinement of 168 months (14 years).  Pet., Ex. 6, at 42.

20  Therefore, this court need not send the matter back to the Board to set a term.  Petitioner is

21  entitled to release and is past his release date.  *See McCullough*, 2007 WL 1593227, at *9;

22  *Brown*, 2007 WL 1288448, at *7; *Thomas*, 513 F. Supp. 2d at 1136-37; *Rosenkrantz*, 444 F.

23  Supp. 2d at 1087.

24          In accordance with the above , IT IS HEREBY RECOMMENDED that:

25          1.  Petitioner's application for a writ of habeas corpus be granted;

26  ////

2.  Respondents be directed to release petitioner from custody within 10 days of any order adopting these findings and recommendations, provided that no legitimate grounds for rescission developed or develop between the date of the Board's grant of parole to petitioner (May 13, 2003) and the date on which the 10 day time limit expires; and

3.  Respondents be directed to file, within 10 days of petitioner's release, a notice with the court confirming the date on which petitioner was released.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:  November 25, 2008.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE